**UNITED STATES of America**

v.

**David Ronald CHANDLER,
a/k/a Ronnie Chandler.**

Nos. CR90–H–266–E, CV–95–H–8005–E.

United States District Court,
N.D. Alabama,
Eastern Division.

April 7, 1997.

Natasha Zalkin, John R. Martin, Martin Bros., P.C., Atlanta, Ga, for petitioner David Ronald Chandler in No. CV95–H–8005–E.

Caryl Privett, U.S. Atty., Herbert H. Henry, III, U.S. Attorney's Office, Birmingham, AL, Harwell G. Davis, III, U.S. Attorney's Office, Huntsville, AL, for respondent U.S. in No. CV95–H–8005–E.

L. Drew Redden, Redden Mills & Clark, Birmingham, AL, Paul M. Dodyk, Cravath Swaine & Moore, New York City, Natasha Zalkin, John R. Martin, Martin Bros., P.C., Atlanta, GA, for defendant David Ronald Chandler in No. CR90–H–266–E.

Caryl Privett, U.S. Atty., Herbert H. Henry, III, Bill L. Barnett, U.S. Attys. Office, Birmingham, AL. Harwell G. Davis, III, U.S. Attys. Office, Huntsville, AL, for respondent U.S. in No. CR90–H–266–E.

**MEMORANDUM OF FINAL DECISION, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING EVIDENTIARY HEARING HELD FEBRUARY 10–12, 1997**

HANCOCK, District Judge.

By Orders dated December 17, 1996, the Court set an evidentiary hearing to receive evidence regarding nine claims for relief asserted in Chandler's petition under 28 U.S.C. § 2255 and motion for a new trial. That hearing was held on February 10–12, 1997, with three additional witnesses' testimony presented by depositions taken February 12 and 19, 1997. These nine final claims for relief were briefed by the parties, and were deemed submitted for decision on March 17, 1997.

### I.  Claims related to the recantation of Charles Ray Jarrell

Four closely-related claims were the primary focus of the evidentiary hearing. Charles Ray Jarrell, Sr. ("Jarrell") testified at Chandler's trial in March 1991 that he had killed Marlin Shuler, and that his motivation for doing so was an offer of $500 by Chandler. (Tr. 3–219 to –28). Now, Jarrell has recanted that trial testimony, and maintains that, although he did kill Shuler, he did so because of resentment of Shuler's abuse of Jarrell's sister and mother. Jarrell now maintains that Chandler never offered him $500, or any money, for Shuler's murder. Further, Jarrell asserts that prosecutors and investigators fabricated the story regarding Chandler's offer of money for the murder, and forced Jarrell to testify in accordance with that fabrication by threatening Jarrell and his son, Billy Jo Jarrell, with the death penalty.

Jarrell's recantation forms the basis for claims III A 1 a and III C 1. Claim III A 1 a is a *Giglio* claim, which asserts that the government knowingly offered Jarrell's false testimony. Claim III C 1 asserts that Jarrell's recantation is newly discovered evidence that warrants a new trial under Fed. R.Crim.P. 33.

Also centered on Jarrell's alleged false trial testimony are claims III A 1 f and III C 6. Each of these claims asserts that Lieutenant Greg Cole, an ABI officer who participated in the investigation of the Shuler murder, testified falsely at Chandler's trial when he said that he had not threatened Jarrell with the electric chair. (Tr. 9–99, 9–112 to –13). Chandler claims that Cole did, in fact, make such threats, and that these threats were part of the design to force Jarrell to testify falsely at trial.

Because these four claims are so closely related, the Court addresses them together. The Court will first summarize the evidence presented by Chandler and the government relevant to these claims, followed by an analysis, findings of fact, and conclusions of law.

The main witness presented by Chandler regarding these claims was Jarrell himself. Jarrell testified at the evidentiary hearing that, on the morning of May 8, 1990, Shuler was at Jarrell's residence. (2/97 Tr. 23).[1] Jarrell stated that Chandler arrived, driving a truck, with Bobby Steed in the passenger seat. (*Id.* at 24). Chandler then saw Shuler, and told Jarrell "this fellow is going to cause you and me a lot of trouble .... you ought to get rid of him." (*Id.* at 25). According to Jarrell's testimony at the hearing, Chandler's statement was not a request for Jarrell to murder Shuler, but rather an exhortation for Jarrell to stop associating with Shuler. (*Id.*). After this brief conversation, Chandler and Steed left. (*Id.*).

Soon thereafter, Jarrell and Shuler began drinking beer together. (*Id.* at 26). After exhausting Jarrell's on-hand supply, the two men drove to a store, purchased two more twelve-packs of beer, and went to Snow's Lake to engage in target practice with two pistols Jarrell had—a .380 and a 9mm. (*Id.* at 26–27). After arriving at Snow's Lake, Jarrell and Shuler drank the beer they had purchased, and took turns shooting the pistols at various objects. (*Id.* at 27). Then, Jarrell confronted Shuler about Shuler's abuse of Jarrell's sister and mother. (*Id.*). Shuler replied that Jarrell's mother and sister were bringing the abuse on themselves. (*Id.* at 28). An argument ensued, and Jarrell shot Shuler with the 9mm pistol, "just [as] a spur of the moment thing." (*Id.*). This first shot struck Shuler in the back. (*Id.*). Shuler fell down, and Jarrell shot him again behind the ear. (*Id.* at 30).[2] Jarrell testified that the shooting had nothing to do with Chandler. (*Id.* at 31).

After killing Shuler, Jarrell returned to the convenience store and purchased another 12–pack of beer, and then proceeded to Chandler's house. (*Id.*). Jarrell attempted to borrow Chandler's truck to aid in disposal of Shuler's body, but Chandler insisted on accompanying Jarrell to Snow's Lake. (*Id.* at 32–33). Chandler and Jarrell transported Shuler's body to another location, buried it, and then returned to Chandler's house, stopping for more beer along the way. (*Id.* at 33). They then took Shuler's car to a remote location, and set it on fire. (*Id.*).

On May 23, 1990, Jarrell was interviewed by the Piedmont Police about Shuler. (*Id.* at 34; Defendant's Ex. 1).[3] Jarrell told the police that he had been with Shuler drinking beer on May 8, but that Shuler had begun driving recklessly, and that Jarrell had insisted on getting out of the car. (Defendant's Ex. 1). According to Jarrell's May 23, 1990 statement, Jarrell had last seen Shuler when he got out of Shuler's car. (*Id.*).

Some time after May 23, Jarrell moved to Illinois, where he was arrested in connection with a car theft charge. (2/97 Tr. 35–36). While in custody in Illinois, Jarrell was interviewed twice by ABI Lieutenant Greg Cole and Calhoun County Deputy Sheriff Max Kirby. (*Id.* at 36). Both interviews occurred on September 20, 1990.

During the first interview, which occurred at 7:35 p.m., Jarrell told Cole and Kirby essentially the same story that he had previously told the Piedmont Police: Jarrell had gotten out of Shuler's car when Shuler began "driving crazy," and had not seen Shuler since. (Defendant's Ex. 2). At the end of the statement, Jarrell added, "no one has ever offered me any money to kill Marty Shuler. I never told anybody I killed him." (*Id.*).

Cole and Kirby disbelieved this story. (2/97 Tr. 38). So, they interviewed Jarrell again at 8:35 p.m. on September 20, 1990. (Defendant's Ex. 3). According to Jarrell, when the questioning resumed, Cole and Kirby told Jarrell that they had a statement

---

**1.** What follows is Jarrell's current version of the events on and after May 8, 1990. A summary of Jarrell's testimony about the Shuler murder at Chandler's trial can be found in the December 17, 1996 "Order Denying Claims III D through III O." *See United States v. Chandler*, 950 F.Supp. 1545 (N.D.Ala.1996).

**2.** At Chandler's trial, forensic evidence indicated that Shuler was shot once above the right ear and once in the back. (Tr. 5–183 to –186). A bullet recovered from Shuler's skull was identified as a 9mm bullet. (Tr. 5–208).

**3.** All references to exhibits in this Memorandum are to the exhibits introduced at the February 10–12, 1997 hearing, unless specified otherwise.

from Chandler indicating that Chandler had paid Jarrell $10,000 or $20,000 to kill Shuler. (2/97 Tr. 38–39). Jarrell asked to see the statement, but the officers were unable to produce it. (*Id.*). Jarrell, according to his testimony, then told Cole and Kirby that the only money Chandler had ever offered him was $500 to "rough up" a boy who worked at a service station, whom Chandler thought was a "pervert." (*Id.* at 39–40). This, according to Jarrell, caused Cole and Kirby to conclude that Chandler had offered Jarrell $500, not $10,000 or $20,000, to kill Shuler. (*Id.* at 40).

Jarrell testified that, during this second episode of questioning, he and Deputy Kirby were "doing a lot of arguing," and Jarrell decided to "play this off as an accident." (*Id.* at 42). Thus, the second statement taken on September 20, 1990 begins by saying that Jarrell and Shuler "got drunk" and went to Snow's Lake. (Defendant's Ex. 3). It then states that "I [Jarrell] was firing my .380 automatic pistol. Marty wanted to shoot it. I turned around & the gun went off and shot Marty in the chest." (*Id.*). The statement goes on to recite that, after shooting Shuler, Jarrell enlisted Chandler's aid in disposing of the body and Shuler's automobile. (*Id.*). Jarrell recalled telling Cole and Kirby these things, and testified that they were true reflections of the statement he gave. (2/97 Tr. 44).

However, after the statement recites that Chandler took Jarrell home, the following sentence appears: "Ronnie Chandler offered me $500.00 to kill Marty Shuler and gave me a 9mm pistol to do it with." (Defendant's Ex. 3). The statement goes on to repeat that the shooting was accidental. (*Id.*). According to Jarrell, his statement to Cole and Kirby ended with the fact that Chandler took him home. (2/97 Tr. 44). Jarrell testified that, at the end of the statement, Cole and Kirby insisted that Chandler had offered Jarrell $500.00 for Shuler's murder and had given Jarrell a 9mm pistol for that purpose. (*Id.*). Jarrell continued to insist that he had killed Shuler with the .380 pistol, but Cole

and Kirby were equally convinced that it was the 9mm supplied by Chandler. (*Id.* at 45). Jarrell signed the statement without reading it. (*Id.* at 46).

Shortly after Jarrell gave these two statement to Cole and Kirby, he was extradited to Alabama. (*Id.* at 46). His attorney, Bill Broome, arranged a deal for Jarrell, in which Jarrell would cooperate with law enforcement by assisting in the location of Shuler's body, and all of the charges against Billy Jo Jarrell would be dropped. (*Id.* at 48–49).[4] Before the details of this deal were finalized, Jarrell purported to show officials the location of the body, but intentionally failed to locate the body. (*Id.* at 68, 87–88; Defendant's Ex. 8). However, after taking a polygraph test and finalizing his deal with law enforcement officials, Jarrell agreed to reveal the location of the body, which he did on September 26, 1990. (Defendant's Ex. 10). The body was excavated and recovered the next day. (*Id.*).

About a month later, Jarrell attended a meeting held at the Calhoun County jail on October 25, 1990. (*Id.* at 50). Present at the meeting were DEA Agent Fred Gasbarro, AUSA Harwell Davis, Calhoun County District Attorney Joe Hubbard, Lieutenant Cole, Deputy Kirby, Jarrell, and Bill Broome. (Defendant's Ex. 4). Initially, Jarrell was told that, in exchange for his cooperation, he would receive a sentence of twenty-five years. (2/97 Tr. 52; Defendant's Ex. 6). According to Jarrell, those present interviewed him first about his participation in Chandler's marijuana-growing operation, and then the subject turned to the Shuler murder. (2/97 Tr. 52). When asked why he killed Shuler, Jarrell responded that "it was because of the abuse upon my mama and my sister and all." (*Id.* at 53). At this point, according to Jarrell, there was a break in the meeting, and everyone left the room except for Max Kirby. (*Id.*). Kirby began insisting that Jarrell should "tell these people what they want to hear," or he would face the possibility of two sentences—a federal sen-

---

4. The parties hotly dispute whether, in fact, there was an agreement to release Billy Jo Jarrell in exchange for Charles Ray Jarrell's cooperation. This dispute is irrelevant, since it is clear that both Jarrell and his attorney believed that such a deal existed, and Jarrell testified accordingly at Chandler's trial. (Tr. 8–114 to –118).

tence for the drug conspiracy and a state sentence for the Shuler murder. (*Id.*). When the meeting resumed, Jarrell told those assembled that Chandler had offered him $500.00 to kill Shuler, and that Jarrell had killed Shuler because of the offer of that money. (*Id.* at.54).

At some later date, Jarrell was called to testify before a grand jury in federal court. (*Id.* at 59). Prior to his testimony before the grand jury, Jarrell recalls a meeting with Joe Hubbard (who was acting as a special AUSA for this case). (*Id.*). Hubbard told Jarrell that he would need to testify regarding why he killed Shuler, and Jarrell replied that he would testify that he killed Shuler "for the money" offered by Chandler. (*Id.*). Prior to the trial of Bobby Steed (another participant in Chandler's drug operation), Jarrell had another meeting with Hubbard to discuss his upcoming testimony. (*Id.* at 60). Again, Hubbard asked him about his upcoming testimony regarding the Shuler murder, and Jarrell said that he would testify that it was motivated by the $500.00 offer. (*Id.* at 61). Jarrell testified that Hubbard knew this was not the truth, because, in a prior meeting with Hubbard, Jarrell had told Hubbard that the real reason he killed Shuler was because of Shuler's abuse of Jarrell's mother and sister. (*Id.* at 62–63).

In addition to Jarrell's testimony, Chandler also presented several witnesses who attempted to corroborate certain aspects of Jarrell's February 10, 1997 testimony. Bobby Steed, one of Chandler's and Jarrell's co-conspirators, testified regarding a conversation sometime after April 1990 between Jarrell and Chandler. (*Id.* at 10). Steed testified that he and Chandler drove past Jarrell's house, and Jarrell came up to the truck to speak with Chandler. (*Id.*). At this point, Shuler appeared on the back porch of Jarrell's house, and Chandler said,

"what's he doing hanging around you?" Jarrell replied that Shuler would be leaving soon, and that was the entire conversation about Shuler. (*Id.* at 11).[5]

Chandler also presented several relatives of Jarrell (who were also related to Chandler or Chandler's wife) who had visited Jarrell while he was in the Calhoun County jail prior to Chandler's trial. Each of these individuals (Lona Hafley, Mary Ruth Wilkinson, and Inez McDonald) testified that she was told by Jarrell that he was going to testify falsely at Chandler's trial because of threats against him and Billy Jo Jarrell. (*Id.* at 95–97, 103; McDonald Depo. at 7–10). In particular, Inez McDonald and Lona Hafley testified that Jarrell told her of midnight interrogation sessions in which law enforcement officials would drag him out of bed and harass him until he agreed to testify in accordance with their wishes. (McDonald Depo. at 7–10; 2/97 Tr. 95). Additionally, these witnesses testified that Jarrell was in extremely poor health due to alcohol withdrawal during the latter part of 1990. (2/97 Tr. 96–97; McDonald Depo. at 6–7).[6]

Chandler also offered the testimony of several individuals who had been incarcerated with Jarrell in the Calhoun County jail (or elsewhere): Troy McFry, Jeffrey Roberts, Paul Watson, and Joseph Barnett. Troy McFry testified that Jarrell had told him, in late 1990 or early 1991, that the government was pressuring him to testify that he had killed Shuler at Chandler's request. (2/97 Tr. 110). McFry and Paul Watson testified about conversations with Jarrell in which Jarrell told them that he killed Shuler because of Shuler's abuse of Jarrell's mother and sister, and that Chandler had never asked him to kill Shuler. (*Id.* at 116–17, 120). Paul Watson testified that he informed AUSA Harwell Davis about this conversa-

---

**5.** The government's attempt to cross-examine Steed was extremely limited, due to Steed's invocation of his Fifth Amendment privilege against self-incrimination. Chandler's counsel represented to the Court that, had Steed been forced to answer, he would have said that, after April of 1990, he and Chandler were finished planting the marijuana fields, and that they would be going out to check on the fields that had already been planted on a regular basis. (*Id.* at 20).

**6.** Jarrell testified that he was in "fairly good condition" while incarcerated in Calhoun County, and said that the lack of alcohol simply made him "irritable." (2/97 Tr. 85). Also, Jarrell never testified that law enforcement officials dragged him out of bed in the middle of the night to interrogate or harass him; Jarrell attributed his false testimony to the threats made by Max Kirby, Greg Cole, and others that Jarrell and his son would be prosecuted. (*Id.* at 54, 64).

tion, but Davis did not seem interested. (*Id.* at 122–23). Finally, Joe Barnett testified that he overheard Jarrell telling another inmate that "he would trade the D.A. Ronald Chandler or his mama, or anyone for that matter, to get his son [Billy Jo] off the hook." (Barnett Depo. at 9). *See also* 2/97 Tr. 374–75 (David Farmer testified that Jarrell told him that Chandler was not involved in the Shuler murder, but that the police were trying to link the murder to Chandler's drug operation).

Finally, Chandler presented defendant's exhibit 6 in support of Jarrell's recollection of the events at the October 25, 1990 meeting at the Calhoun County jail. Exhibit 6 consists of AUSA Harwell Davis' notes from that meeting. (2/97 Tr. 250). Four of the five pages of notes deal with Jarrell's involvement in Chandler's marijuana growing operation. (Defendant's Ex. 6). However, on the last page, the following appears:

*Marlin Shuler*

Donna Shuler, MS ex-wife & CJ's mother (ImaJean Johnston) were having trouble w/ M.S.—told him not to do it anymore. He came over to beat them & tried to shoot him.—No more trouble for awhile.

MS 2nd ct. date he was drunk & *MS and he* went & got beer. He called him something & he shot him 1st in chest, 2nd in neck.

RC had offered him $500 to kill MS in CJ's bkyd.

Once before RC gave him a 9mm & told him to kill.

(Defendant's Ex. 6). According to Jarrell, Davis' notes reflect the fact that, at the October 25, 1990 meeting, he told the assembled law enforcement personnel that he had killed Shuler because of an argument regarding Shuler's abuse of Jarrell's sister and mother, then changed his story to reflect what Max Kirby had instructed him to say. (2/97 Tr. 55–58).

The government's witnesses denied key aspects of Jarrell's testimony at the evidentiary hearing. Lieutenant Greg Cole testified about the September 20, 1990 interviews of Jarrell in Illinois. Cole stated that Jarrell told him and Deputy Kirby that Chandler had offered him $500 to kill Shuler, and never made any statement regarding any $500 to "whoop" any "pervert." (*Id.* at 161). Jarrell maintained that the shooting was an accident, but did say that Chandler had offered him $500 to do the job. (*Id.* at 162). Further, as reflected in defendant's exhibit 3, Jarrell maintained that he had shot Shuler with the .380 pistol. (*Id.*). Also, Cole testified that, after Jarrell was reassured that he would not receive the death penalty, Jarrell was "cooperative and friendly." (*Id.* at 185).

Cole also gave testimony regarding the October 25, 1990 meeting at the Calhoun County jail. Cole stated that he and Deputy Kirby were present only for the beginning of that meeting, and left immediately after it began. (*Id.* at 167–68).

The government also called Joe Hubbard, the Calhoun County District Attorney who acted as a Special Assistant U.S. Attorney for the Chandler case. Hubbard's recollection of the October 25, 1990 meeting was that Jarrell attributed the Shuler murder to Chandler's offer of money, not Shuler's abuse of Jarrell's family members. (*Id.* at 202). Also, Hubbard testified that Jarrell never informed him that the "real" motivation for the murder was that abuse; according to Hubbard, Jarrell consistently said that the murder was motivated by Chandler's solicitation. (*Id.* at 203–04).

AUSA Harwell Davis also testified. He related his recollection of the October 25, 1990 meeting at the Calhoun County jail, and said that there was never any question that Jarrell's motive for the Shuler murder was Chandler's offer of money. (*Id.* at 251–52). However, Davis did recall Jarrell mentioning his dislike for Shuler, arising from Shuler's abuse of Donna Shuler and Imogene Johnson. (*Id.*). But, regarding his notes of the October 25 meeting (defendant's ex. 6), Davis recalled Jarrell saying that he and Shuler had gotten into an argument of some sort, and that was when Jarrell decided to do what Chandler had asked him to do and kill Shuler. (*Id.* at 280, 285–86).[7] Davis also denied

---

7. According to Davis, Jarrell did not want to

admit that he had shot Shuler in the back, and so

that Paul Watson had reported any conversation with Jarrell to him. (*Id.* at 257).

Although called by Chandler, Max Kirby contradicted some aspects of Jarrell's story. Kirby denied Jarrell's assertion that Kirby had told Jarrell on September 20, 1990 that Chandler had already confessed to some involvement in the Shuler murder. (*Id.* at 327–28). Kirby, like Cole, denied having arguments with Jarrell on that occasion, and said that Jarrell was "real nice" and "didn't argue about anything." (*Id.* at 328). Also, in accord with Cole's testimony, Kirby testified that he left soon after the beginning of the October 25, 1990 meeting at the Calhoun County jail. (*Id.* at 331, 333).[8]

Finally, the government called Bernard Gooden as a witness. Gooden testified that he had been an inmate at the Atlanta federal prison in early 1996, and had been Jarrell's cellmate. (*Id.* at 296–98). Gooden related a conversation with Jarrell in which Jarrell said that he was recanting his trial testimony because he felt that the government had "screwed" him with regard to his sentence. (*Id.* at 298). In addition, according to Gooden, Jarrell feared that his throat cancer would mean that he would not survive to complete his 25-year sentence, and so had decided that at least Chandler should live. (*Id.* at 298–99).[9]

■ Having reviewed the evidence presented at the hearing, the Court must obviously assess the credibility of the various witnesses who testified, particularly Charles Ray Jarrell. There are several factors that undermine Jarrell's credibility, which the Court will address in turn.

First, it is obvious from the record that Charles Ray Jarrell has a long relationship of friendship with Chandler, who is Jarrell's brother-in-law. At Chandler's trial, Jarrell testified that he lived with Chandler, was employed by Chandler doing odd jobs, watching marijuana patches, and making marijuana acquisition runs to Texas; Jarrell was paid in money, food, cigarettes, and other items. (Tr. 3–186 to –88, 3–196 to –219). Jarrell was also centrally involved in the efforts by Chandler and Bobby Steed to plant hundreds of marijuana patches and harvest the resulting crop. (Tr. 3–191 to –94). Jarrell was entirely dependent on Chandler for income and support for the years 1989 and 1990. (Tr. 4–58). Any testimony by Jarrell favorable to Chandler must be viewed in light of the relationship between the two men, and particularly the income that Chandler provided for Jarrell just prior to Jarrell's arrest.

Second, the record makes it abundantly clear that Jarrell's memories of the events of 1990 may be suspect. To begin with, Jarrell was a very heavy drinker at the time that Shuler was murdered. Jarrell testified at Chandler's trial that he had been drinking heavily since childhood, and said that he was either intoxicated or on his way to becoming intoxicated at all times. (Tr. 4–36). Jarrell's son, Billy Jo Jarrell, characterized Jarrell as an alcoholic. (Tr. 8–142). Jarrell testified at trial that he consumed at least two dozen beers on the day Shuler was murdered. (Tr. 4–23 to –24).[10] In addition, both Jarrell and Billy Jo testified at Chandler's trial that Jarrell's drinking severely impacts his memory:

Q. Does your drinking ever affect your memory?

---

initially said that he had shot Shuler in the chest after some argument about Shuler's abusiveness, although still because of Chandler's offer of money. (*Id.* at 285–86). However, after being pressed with the forensic evidence indicating that Shuler had not been shot in the chest, Jarrell admitted that there was no real argument and that he had shot Shuler in the back. (*Id.*).

8. Bill Broome, Jarrell's attorney, testified that Kirby might have stayed at the meeting to guard Jarrell, but Broome's memory of the meeting was sketchy, at best. (*Id.* at 350, 361).

9. Apparently, Jarrell's throat cancer has been successfully treated. (*Id.* at 81). Also, Chandler

has submitted Jarrell's medical records, which show that Jarrell began complaining of throat pain in May 1993. An affidavit from one of Chandler's attorneys, Patricia Perlmutter, establishes that Jarrell attempted to contact her in September 1992 regarding his testimony against Chandler. This evidence tends to rebut Gooden's testimony that Jarrell's illness is a motivation for his current testimony.

10. Jarrell's second statement to Cole and Kirby on September 20, 1990 begins by saying "me & Marty Shuler got drunk." (Defendant's Ex. 3).

A. I expect it does.

Q. Makes you forget a lot of things, doesn't it?

A. Yes.

(Tr. 4–36 (testimony of Jarrell)). Billy Jo Jarrell testified that he believed that Jarrell was unable to recall what really happened on May 8, due to his alcohol abuse. (Tr. 8–142 to –43).

In addition, between the Shuler murder and Jarrell's arrest in Illinois, Jarrell was playing with a rattlesnake in his backyard. (Tr. 4–30). Predictably, the snake bit him, and Jarrell was severely injured and hospitalized. (*Id.*).[11] According to Billy Jo Jarrell, his father's heart stopped five times en route to the hospital:

Q. Your father got literally snake bitten, didn't he?

A. Yes, sir. He died twice in Piedmont and was supposed to have died three times on the way to Birmingham. The doctors said that he was dead so long the last time that he died that his brain would never be right because of the loss of oxygen.

Q. Do you think his brain has been right since that happened?

A. No, sir. No, sir, it hasn't.

(Tr. 8–142).

The testimony of Jarrell and his son makes it clear that Jarrell's memory is impaired by both alcohol and by the snakebite incident. This impairment must be taken into account in weighing Jarrell's account of the events in 1990, now nearly seven years ago.

Third, Jarrell has made numerous prior inconsistent statements that reflect poorly on his willingness to be truthful. When he was first asked about the Shuler murder, he denied any involvement and made up a story that he and Shuler had gotten into an argument in Shuler's car. (Defendant's Exs. 1, 2). After it became clear that he was connected with Shuler's death in some way, he embarked on an attempt to tell a variation of

the truth—that he had indeed shot Shuler (in the chest, with the .380), but that it was an accident. (Defendant's Ex. 3). Later, before the grand jury and during two full-length trials in this court, Jarrell testified under oath that he shot Shuler intentionally (in the back, with the 9mm) for the offer of money made by Chandler. Now Jarrell testifies, again under oath, that he killed Shuler intentionally, but was motivated by Shuler's abuse of Donna Shuler and Imogene Johnson. Jarrell's statements since September 20, 1990, which have all been identical in all but a few key details, make it difficult to place much faith in his current testimony.

Also, the evidence received at the hearing shows that Jarrell lied to relatives that visited him at the Calhoun County jail. As noted above, Jarrell told Lona Hafley and Inez McDonald that law enforcement officials were interrogating him at all hours of the night, harassing him, and depriving him of sleep. However, Jarrell himself recounted no such incidents, and made no similar statements to his jailmates, who could have been in a position to know that such interrogations were not occurring. Also, Jarrell told Hafley and McDonald that he was suffering from alcohol withdrawal and was in extremely poor health, although he testified at the hearing that he was in "fairly good condition" and that the lack of alcohol did nothing but cause him to be "irritable." [12]

Jarrell's prior inconsistent statements (and sworn testimony) about the Shuler murder and about his motivation for testifying against Chandler certainly suggest that Jarrell manipulates his account of events to suit his then-present motives. Jarrell's disregard for the truth speaks poorly about the credibility of his testimony at the hearing.

Another factor that subtracts from Jarrell's credibility is the inconsistency between his version of events and the version given by Cole, Kirby, Davis, and Hubbard. For example, Jarrell testified that, during a break

---

**11.** Jarrell's medical records, submitted March 18, 1997, reflect that Jarrell underwent a tracheostomy as a result of the snakebite.

**12.** Cole and Kirby also believed that Jarrell was in good health in September 1990, and did not appear to be suffering from any alcohol withdrawal symptoms. (2/97 Tr. 189, 325).

in the October 25, 1990 meeting, Kirby pressured him to tell the assembled law enforcement people what they wanted to hear, and abandon the story that Jarrell had killed Shuler in retaliation for abuse. However, both Kirby and Cole testified that they were not present at the meeting, but had left to interview another witness elsewhere. Jarrell characterized his conversations with Cole and Kirby in Illinois as acrimonious, while Cole and Kirby described Jarrell as friendly and cooperative. Jarrell testified that, at the October 25, 1990 meeting, he told all assembled (including Davis and Hubbard) that he had killed Shuler because of the abuse, but Davis and Hubbard recalled the meeting differently, and stated that Jarrell consistently said (on that occasion and others) that he had killed Shuler because of Chandler's offer of money.

As noted above, Jarrell's relationship with Chandler, his alcohol-related memory problems, and his prior inconsistent statements all detract from Jarrell's credibility. There are no corresponding reasons for the Court to doubt the veracity of Cole, Kirby, Hubbard, or Davis. Each seemed to be forthright and honest in his testimony, and nothing in the record suggests that any of them is being untruthful, let alone all of them. So, the inconsistency between Jarrell's somewhat suspect testimony and the ostensibly reliable testimony of Cole, Kirby, Hubbard, and Davis is another factor that undermines Jarrell's credibility.

Finally, Jarrell's story itself contains elements that are obviously untrue. One stark example is Jarrell's account of his second interview with Cole and Kirby on September 20, 1990. Jarrell testified that he insisted that he had killed Shuler accidentally with his .380 pistol, but that Cole and Kirby were equally insistent that the shooting was intentional, and was accomplished with a 9mm pistol supplied by Chandler. (2/97 Tr. 44–45). According to Jarrell, Cole and/or Kirby added the portion of the statement (defendant's Ex. 3) regarding Chandler's offer of

$500 and the 9mm pistol Chandler gave to Jarrell.

However, it is obvious from the record that Cole and Kirby could not have invented the story about the 9mm pistol on that occasion. The day *after* the September 20, 1990 interview in Illinois, law enforcement personnel conducted a search of Chandler's residence, finding 9mm ammunition, a 9mm gun cleaning kit, and a box for a 9mm pistol, but the pistol itself was absent. (Tr. 7–105 to –108). In addition, a week after the September 20, 1990 interview with Jarrell, Shuler's body was recovered (*see* defendant's ex. 10), and investigators recovered a 9mm bullet from Shuler's skull. (Tr. 5–184, 5–208). It is not believable that Cole and Kirby, through luck or clairvoyance, had the foresight to insist that Jarrell had received a 9mm pistol from Chandler and had killed Shuler with it. Rather, it is clear that Jarrell himself, who was the only person who had personal knowledge of the true facts at that time, must have supplied Cole and Kirby with the information contained in the statement.

Finally, Jarrell's performance on the witness stand showed the weakness of his current account of events and his susceptibility to manipulation. On direct examination, Jarrell testified that, during the September 20, 1990 interviews with Cole and Kirby, he stated that he had shot Shuler in the chest. (2/97 Tr. 42 ("I figured, well, I would play this off as an accident, and that was the reason that I said that I turned and the pistol went off and it hit him in the chest.")). This testimony was consistent with what Cole and Kirby recorded during the interview. (Defendant's Ex. 3).

However, on cross-examination, the following exchange took place:

Q. Do you remember the first time you talked to officers Kirby and Cole [13] you said that you had shot Shuler in the chest face to face? Do you remember telling him that?

A. No.

---

[13]. It is undisputed that the first time Jarrell was interviewed by Cole and Kirby was September 20, 1990.

Q. Do you remember them telling you, that's not what the autopsy report shows.[14] It shows, in fact, you shot him in the back, and it was after they said that you then said okay, I did?

A. No.

Q. Are you denying you told them that?

A. Unless you've got it written down, I deny it.

Q. You deny it because it's not true or because you don't remember?

A. Because it ain't true.

Q. Well, is it your position at this point you didn't even shoot the man?

A. I never said I didn't shoot him. I shot him graveyard dead.

Q. Well, you testified on direct that you shot him in the—

A. I should have shot him graveyard dead three years before that.

Q. You testified on direct you shot him in the back.

A. That's the truth.

Q. But you just don't remember telling Kirby or Cole that?

A. I never mentioned shooting him in the front.

> \*     \*     \*     \*     \*     \*

THE COURT: But you don't recall ever telling Mr. Cole or Mr. Kirby that you shot him in the front?

THE WITNESS: No, sir.

THE COURT: You didn't do that in Illinois?

THE WITNESS: Not that I remember, no, sir.

(2/97 Tr. 79–81).

It speaks volumes about the veracity of Jarrell's testimony that he admitted on direct examination telling Cole and Kirby that "the pistol went off and it hit him in the chest," and a few minutes later on cross-examination vehemently denied ever telling them that. This contradiction on such a material point of Jarrell's story suggests that Jarrell's planned

direct examination went well, but that Jarrell was unable to manage his current account of events when the same information was sought in the less organized, more spontaneous context of cross-examination. Jarrell's failure to remember something that he had just said on direct examination and that had just been shown to him in a document (defendant's ex. 3) severely undercuts his credibility.

So, to conclude, there are numerous substantial grounds on which the Court believes that Jarrell's current testimony is suspect and unworthy of belief. However, Chandler presented several witnesses in an attempt to corroborate Jarrell's current testimony. The Court addresses those witnesses next.

The first corroborating witness was Bobby Steed, who was convicted as a member of the Chandler drug conspiracy. As noted above, Steed recalled a conversation between Jarrell and Chandler, with Shuler present on Jarrell's back porch, sometime after April 1990. Steed did not hear any mention of an offer of money by Chandler for Jarrell to kill Shuler at that time.

However, Steed's testimony is also suspect, for three main reasons. First, it is clear that Steed and Chandler had a solid working relationship as partners in the marijuana growing operation. (2/97 Tr. 17). Steed, who was indicted for conspiring with Chandler in growing marijuana, and who was later convicted, thus has a strong incentive to remember facts in a way favorable to his former business partner and friend.

Another major problem with Steed's testimony was his sketchy memory of the date on which the conversation in question occurred. He was unable to place a precise date on the conversation, but could only say that it occurred "after April." However, it was also clear from Steed's testimony (and Chandler's counsel's proffer of what Steed would say if allowed to answer certain questions) that, after April 1990, Steed and Chandler were regularly or daily riding out together to

---

**14.** This question apparently refers to a conversation Harwell Davis recalled during the October 25, 1990 meeting with Jarrell at the Calhoun County jail. (2/97 Tr. 251, 281–86).

check on their marijuana fields. There could have been any number of times that the two men drove past Charles Ray Jarrell's house (which was next door to Steed's residence) and had conversations with Jarrell. Steed's understandably dim memory of a conversation that occurred nearly seven years ago makes his testimony nearly useless to Chandler.

Finally, the present account of the conversation given by Steed and Jarrell, both of whom testified that Steed was present on the morning of May 8, 1990, is suspect because Jarrell never told any law enforcement officials, despite numerous interviews, about Steed's presence. (2/97 Tr. 74). When asked why he did not reveal Steed's presence, despite being asked "all the particulars" about the conversation on May 8, Jarrell replied "I never was asked." (*Id.*). This explanation defies belief, because it is directly contradictory to Jarrell's testimony that he was repeatedly *volunteering* information to everyone he talked with that exculpated Chandler. Surely, Jarrell would have also mentioned that another witness, Steed, could have validated his account of the May 8 conversation with Chandler, if indeed Jarrell was pleading with law enforcement officials to recognize Chandler's non-involvement in the Shuler murder.[15]

So, Steed's testimony (aided by Jarrell's account of Steed's presence on May 8) cannot serve to corroborate Jarrell's current version of the events of May 8, 1990. Steed's relationship with Chandler and his poor memory of the date on which he was present make his testimony completely unhelpful to Chandler.

Chandler also introduced prior consistent statements made by Jarrell to various relatives: Lona Hafley, Inez McDonald, and Mary Ruth Wilkinson. According to these witnesses, they visited Jarrell at the Calhoun County jail prior to the Chandler trial, and Jarrell told them that law enforcement officials were engaging in Gestapo-style midnight interrogations and harassment in an effort to force him to testify falsely against

Chandler. It is clear that no such midnight interrogations occurred—accounts of them were conspicuously absent from Jarrell's testimony or the testimony of others incarcerated at the Calhoun County jail. Also, Jarrell told Hafley, McDonald, and Wilkinson that he was in terrible physical condition, when he himself stated that he was in "fairly good condition" at the time.

Jarrell also had conversations with other prisoners before the Chandler trial in which he said that law enforcement officials were forcing him to testify falsely against Chandler. Chandler argues that these prior consistent statements buttress Jarrell's current story of events. The Court cannot agree.

Charles Ray Jarrell had a powerful incentive to get word to Chandler that Jarrell was an unwilling participant in the government's case against Chandler. This incentive arose not only from Jarrell's relationship with Chandler, but also from the possibility that Chandler might retaliate against Jarrell for betraying him to law enforcement officials. Harwell Davis testified at the hearing that another witness who testified against Chandler and Steed, Paul Watson, experienced an attack against his home with guns and a fire bomb in retaliation for his testimony. (2/97 Tr. 258 to –59). Davis participated in the prosecution of the individuals who apparently attacked Watson's residence. (*Id.*).

Taking judicial notice of the records of this Court, it appears that two individuals—Lester Hackney and Dewayne Lane—were charged in a four-count superseding indictment dated June 5, 1991. The indictment charged the two men with conspiring to retaliate against another witness, Connie Farmer, and also charged them with firebombing her residence in retaliation for her cooperation with authorities in prosecuting Chandler and his co-conspirators. (*See United States v. Hackney*, CR91–AR–91–E (N.D.Ala.)). Lester Hackney entered a plea of guilty on the conspiracy charge, and the case proceeded to trial against Lane, who

---

**15.** One potential explanation for Jarrell's failure to mention Steed's presence might be that Jarrell did not wish to unnecessarily implicate Steed in the marijuana growing operation. However, this cannot be the correct explanation, because Jar-

rell gave law enforcement officials a great deal of information during the October 25, 1990 meeting about Steed's involvement, and this information was revealed prior to any discussion about the Shuler murder. (Defendant's Exs. 4, 6).

was convicted on all counts under which he was charged.[16] At Lane's trial, the government offered the testimony of Paul Watson's wife, Ruth Ann Watson, to relate an identical attack on the Watson residence that occurred on the same night that Farmer's house was firebombed. This evidence was offered under Rule 404(b). Lane's appeal to the Eleventh Circuit following his conviction and sentence was unfruitful; the Court of Appeals affirmed by an unpublished order dated January 4, 1993.

Apparently, Charles Ray Jarrell feared similar reprisals arising out of his cooperation with the government, as the following excerpt from Jarrell's sentencing hearing reveals. After being asked if there was anything he wanted to say in the way of mitigation before a sentence was imposed, Jarrell's attorney generally spoke about Jarrell's cooperation with the government, and then said this:

> Mr. Jarrell also assisted in the location of a body of Martin Schueller [sic] that he had buried. And I personally don't think that the government would have ever found that body unless they happened to have stumbled on it. I happen to have been present when Mr. Jarrell took them to the location where the body was. And I would proffer to Your Honor that it was in a very very remote location. *He also risks danger to his family and the other people that are on the outside by giving this information.* And I know personally, or I know that from what they have told me personally, that there was some pressure on him from various sources not to continue to talk and not to continue giving all of this information.

(Jarrell Sentencing Hearing at 4) (emphasis added). Jarrell's attorney's statements at the sentencing hearing, which was held on April 25, 1991, came exactly one week prior to the night on which Lester Hackney and Dewayne Lane used molotov cocktails and firearms to retaliate against Connie Farmer and Paul Watson for testifying against Chan-

dler and his co-conspirators. In addition, lest we forget, the government's entire case against Chandler with regard to Count III, and the whole focus of Jarrell's testimony, was that Chandler had ordered Shuler killed in retaliation for Shuler's cooperation with the Piedmont Police.[17]

So, the record reveals why Charles Ray Jarrell might have told relatives and jailmates about the ruthless pressure allegedly exerted upon him by law enforcement. The relatives were also related to Chandler's wife, and if Jarrell could somehow communicate indirectly to Chandler that he had not betrayed him, or had done so under extreme duress, Jarrell might avoid the fate that Paul Watson and Connie Farmer suffered. Even the context of Jarrell's conversations suggests this explanation. For example, Troy McFry, who testified that he knew Jarrell through Chandler, testified that Jarrell, on his own initiative, approached McFry and told him that the government was forcing him to lie about Chandler. (2/97 Tr. 109 to – 10). According to McFry, Jarrell was apparently very eager to communicate this story of police threats, even though McFry was hesitant to talk to Jarrell at all. (*Id.*).

Taking a step back to look at the overall picture painted by the evidence, the only coherent explanation for Jarrell's behavior is that Jarrell acted in his own self-interest at all times after being arrested. Officers Cole and Kirby testified that, when Jarrell was first arrested, he was very afraid that he might receive the death penalty if he told the truth about the Shuler murder. (*Id.* at 160, 335). After Cole and Kirby promised to recommend against a capital indictment if Jarrell told the truth, Jarrell became pleasant, cooperative, and forthcoming, and remained so in subsequent conversations with law enforcement officials and prosecutors. But, in order to avoid angering Chandler, Steed, and the other defendants in the conspiracy case, Jarrell told anyone that would listen that his cooperation was the result of

---

**16.** Count Three of the indictment charged Hackney with soliciting Lane to firebomb Farmer's residence. Lane was convicted under counts One, Two, and Four on July 11, 1991. (*see Lane* trial transcript at 678).

**17.** The Court is satisfied that Jarrell did not forget.

threats and harassment by the police, which Jarrell had allegedly resisted as much as possible, given his weakened physical condition.

To conclude, the prior consistent statement given by Jarrell to relatives and jailmates do not bolster the credibility of his current version of events. Rather, they were more likely a reflection of the pressure and threats that Jarrell was experiencing from Chandler or those connected with Chandler not to cooperate with the government. In addition, the corroboration of Jarrell's trial testimony by various pieces of evidence [18] forces the conclusion that it was Jarrell's trial testimony, not his current story, that is true. Thus, the Court finds that Chandler has failed to carry his burden of showing that Jarrell's trial testimony was false.[19] Also, Chandler has failed to prove that Greg Cole's testimony at trial was false. Thus, claims III A 1 a, III C 1, III A 1 f, and III C 6 are due to be denied.

■ A final assertion by Chandler requires a brief discussion. Chandler asserts in his February 28, 1997 brief (page 7) and in his March 17, 1997 brief (page 6) that Harwell Davis' notes of the October 25, 1990 meeting were *Brady* material that should have been disclosed to the defense. Chandler asserts that the notes reflected an alternative motivation for the Shuler murder that would have exculpated Chandler.

The Court disagrees. As the transcript of Chandler's trial reveals, Chandler's counsel was well aware of the fact that Jarrell might have killed Shuler because of Shuler's abusiveness. Jarrell was cross-examined extensively about this subject, and Billy Jo Jarrell gave similar testimony. It is absurd to suggest that this information was somehow "suppressed" in violation of *Brady* under these circumstances. Furthermore, Davis' notes do not refute Jarrell's trial testimony that he killed Shuler for Chandler. Indeed, the

maker of the notes—Davis himself—recalled Jarrell's statements on October 25, 1990 as being consistent in attributing the motive for the murder to Chandler's offer of money. Davis' notes were not *Brady* material, and this newly-raised claim must be denied.

## II. Claim related to Charles Ray Jarrell's polygraph test

Claim III B 2 b asserted by Chandler is a *Brady* claim alleging that the government failed to turn over the results of a polygraph examination administered to Jarrell. According to Jarrell, the test revealed that he was "lying about something." Now that the records of the polygraph test have been produced by the government, Chandler appears to have abandoned this claim.

On September 21, 1990, Jarrell agreed to take investigators to the scene of Shuler's body. (Defendant's Ex. 8). However, Jarrell intentionally failed to locate the body on that occasion. (2/97 Tr. 86 to 87). Five days later, a polygraph test was administered, in which Jarrell was asked whether he was lying about the location of Shuler's body. (Defendant's Ex. 9). The examiner believed that Jarrell was being deceptive in answering these questions. (*Id.*). Later that day, Jarrell led officials to the correct location of Shuler's body, which was excavated and recovered the next day. (Defendant's Ex. 10).

Originally, Chandler's attorneys had suspected that the polygraph might have something to do with the substance of Jarrell's trial testimony, but it did not. There is no dispute that the material contained in defendant's exhibit 9 would not have been exculpatory to Chandler or useful to his attorney at trial, and so the government did not violate *Brady* by failing to disclose it. Claims III B 2 b must be denied.

---

18. The absence of the 9mm gun from Chandler's house, together with the testimony of Raymond Pointer and Billy Jo Jarrell, were in accord with Jarrell's trial testimony. Also supportive of Jarrell's testimony was government's trial exhibit 45, which was a taped conversation in which Chandler remarked that he would "just have to kill somebody."

19. The Court makes no finding regarding the truthfulness of the testimony of Bernard Gooden, since the Court has ample other reasons to find Jarrell's testimony unworthy of belief.

### III.  Scottie Surrett Bagley

██ Claim III B 5 f was another *Brady* claim asserted by Chandler.  Here, Chandler alleged that Scottie Elaine Bagley (formerly known as Scottie Surrett) had given police and/or the prosecution statements indicating that someone other than Chandler might have been responsible for the apparent murder of Jeff McFry.  Had this information been given to Chandler before trial, argues Chandler, he could have rebutted the prosecution's attempts to link him to McFry's disappearance by calling Surrett as a witness.

The parties took Surrett's deposition on February 19, 1997, and Surrett's testimony turned out to be less than wholly favorable to Chandler.  A good part of Surrett's testimony was devoted to her allegations that AUSA Davis manipulated her testimony at the grand jury in order to link her boyfriend, Scott Hackney, to Chandler and to Jeff McFry's death.  This portion of the deposition is wholly irrelevant, because the government did not present any such evidence linking Hackney and Chandler at Chandler's trial.

Surrett did testify that Hackney was jealous of her relationship with Jeff McFry, and told her to stay away from him.  (Bagley Depo. at 6–7).  She also related an incident at the "Pastime Lounge," in which Hackney and McFry got into a fight, and McFry attempted to run over Hackney with an automobile.  (*Id.* at 9–10).  Surrett also recalled a conversation with Scott Hackney after McFry had disappeared in which Hackney said that he had killed McFry and thrown him down a well.  (*Id.* at 20).  She insisted that this was a joke, and that Hackney was not serious at the time.  (*Id.*).  So, the information Surrett would have been able to give in an attempt to shift the responsibility for McFry's death away from Chandler and to Hackney was extremely limited.  Surrett also testified that McFry was afraid of Jack Buttram, as well as other individuals whose marijuana he had stolen.  (*Id.* at 88).

On the other hand, Surrett could have provided extremely damaging testimony im-plicating Chandler in McFry's death.  The government cross-examined Surrett concerning several statements she gave to law enforcement officials.  The first statement, given to ABI Agent Perry Beasley on September 20, 1990, contains the following:

During the last couple of months, Jeff has told me that he pulled up marijuana plants belonging to Ronald Chandler.  Jeff stole pot from Chandler on many occasions.  Jeff told me that he knew that Chandler knew he was stealing the pot and that one day Chandler would kill him.  Jeff has a not-give-a-damn attitude.  The last time Jeff told me he had stolen Chandler's pot was about a month ago.

Jeff has also told me that Jack Buttram had accused him of stealing his (Buttram's) planted marijuana.

Jeff used to watch Chandler go water marijuana plants and he would tell me about planning to make pot theft raids on Chandler's pot.

Jeff told me that, sometime last year, he intercepted one of Chandler's marijuana drops and sold the pot he stole for $45,000.

(2/24/97 "Government's Response to Defendant's Request for Production of Documents," attachment 2).[20]

When questioned about the September 20, 1990 statement, Surrett acknowledged the truthfulness of all the statements relating to Chandler.  (Bagley Depo. at 71–73).  Surrett was interviewed again, this time by Cole and Kirby, on October 22, 1990.  In that interview, Surrett told Cole and Kirby that, following a meeting between Hackney and Chandler, in which Chandler indicated that he had some work that Hackney could do, Hackney told her to stay away from McFry, because "somebody is about to go missing."  According to the statement, these events occurred "2 days to a week before Jeff McFry disappeared."  During the interview, Surrett also repeated her previous statement that Hackney had jokingly said that he had killed McFry and thrown him in a well.  Also, at the end of the October 22, 1990 statement, Surrett told Cole and Kirby that Jeff McFry

---

**20.**  All of Scottie Surrett's statements to investigators that the Court will refer to are attached to the February 24, 1997 response filed by the government.

had asked Surrett to take him into the woods to steal some of Chandler's marijuana; this was one month before McFry disappeared. Surrett did not dispute the truth of any of these statements in her deposition. (Bagley Depo. at 73–74).

Surrett talked with Cole again on October 23, 1990 over the telephone. She told Cole that Hackney had spoken to her and was "extremely upset" about her talking to law enforcement. The statement goes on as follows:

> He [Hackney] asked her [Surrett] if we knew about his meeting with Ronnie Chandler prior to McFry disappearing. He wanted to know if agents asked about his telling Scottie to stay away from Jeff McFry because he was about to go missing.
>
> Hackney contacted his brother Lester Hackney and asked him not to tell about the meeting between Scott Hackney and Ronnie Chandler.

Surrett elaborated on this conversation with Scott Hackney in her deposition; Hackney told Surrett that if she revealed his conversation with Chandler, Hackney would likely be convicted of murder. (Bagley Depo. at 75).

Surrett gave another statement to Cole on December 11, 1990. The last paragraph of that statement similarly implicates Chandler in soliciting Hackney to kill McFry:

> Hackney has been extremely nervous after being interviewed about the death of Jeff McFry. After his interview, Hackney told Scottie Surrett to deny ever hearing him state that McFry was about to go missing. Hackney told Surrett that Ronnie Chandler was talking about Jeff McFry going missing when he and Chandler were at Lester Hackney's house. Hackney told Surrett that if the law found out about this that he would be indicted and if so, would take several others with him.

Chandler argues that Surrett's statements to investigators were *Brady* material because the statement indicated that someone other than Chandler might have killed McFry—either Hackney, acting alone out of jealousy, or Jack Buttram. The problem with Sur-

rett's testimony though, was that the government was able to elicit a great deal of extremely damaging testimony that implicated Chandler in McFry's murder. Even if Hackney killed McFry, the jury would have heard that Surrett reported to Cole on December 11, 1990 that the discussion between himself and Chandler was about McFry "going missing," and that soon afterward McFry did disappear. And Surrett's statements about McFry's death concentrate almost exclusively on Chandler as the likely suspect—Buttram only receives passing treatment. If Chandler's trial attorney had called Surrett as a witness, the government would have been able to introduce testimony that McFry had stolen a great deal of marijuana from Chandler, that Chandler knew this, and that McFry believed Chandler would kill him in retaliation. This turn of events would not have been favorable to Chandler.

So, to conclude, there was no *Brady* violation related to Scottie Surrett. Chandler's trial counsel fought to keep her from testifying, and for good reason: her testimony would have been terribly incriminating to Chandler. Claim III B 5 f must be denied.

## IV. Burroughs/McFry Alternative Suspects

Claims III B 5 g, III B 6 a, and III B 6 b are all *Brady* claims alleging that the government failed to disclose statements indicating that someone other than Chandler might have killed Patrick Burroughs and Jeff McFry. At the evidentiary hearing, Chandler presented three witnesses—Joe Barnwell, David Fortenberry, and Mike Bundrum—all of whom testified about either Burroughs or McFry.

■ David Fortenberry's testimony was of little value to Chandler. Fortenberry testified that someone had burglarized his house, and he suspected Burroughs of being involved. (2/97 Tr. 141). Fortenberry communicated indirectly with Burroughs, telling him not to come around any more, and Burroughs showed up. (*Id.*). At this point, Fortenberry came out of his house with a gun, which he fired into the air to scare Burroughs. (*Id.*). Fortenberry then threw the gun on the ground, insisting that he could run Burroughs off without it. (*Id.*). Accord-

ing to Fortenberry, he never saw Burroughs again, but was interviewed by Calhoun County officers about the incident. (*Id.* at 141 to –43).

Fortenberry's testimony was not exculpatory to Chandler, because there was no evidence that Fortenberry actually killed Burroughs. The only evidence in the record is that Fortenberry wanted to scare Burroughs, and concluded that shooting him was unnecessary to "run him off." Fortenberry never expressed any intent to kill Burroughs or took any action that would suggest such an intent. Because Fortenberry's statement or testimony would have been unhelpful to Chandler, the government's failure to disclose his alleged statement to the Calhoun County police did not violate *Brady*. Claim III B 6 a must be denied.

■ The remaining two witnesses—Mike Bundrum and Joe Barnwell—testified about persons who had threatened to kill (or bragged about killing) Burroughs and McFry, respectively. Both men testified that they gave statements to the police regarding these alternate suspects (Steve Donnely and Jack Buttram, respectively). Joe Barnwell's statement to ABI Investigator Perry Beasley was produced by the government to Chandler in the discovery that immediately preceded the hearing. (Defendant's Ex. 11). AUSA Davis admitted that he had a copy of Barnwell's statement in his file at the time of Chandler's trial, but accidentally overlooked it and failed to consider turning it over as *Brady* material. (2/97 Tr. 290 to –92).

■ In order for evidence to warrant relief under *Brady*, it must be "material," that is, there must be a "reasonable probability" that the result of the trial would have been different if the evidence had been disclosed prior to trial. *Kyles v. Whitley*, 514 U.S. 419, ——, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). Under the "reasonable probability" standard, prejudice is shown if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at ——, 115 S.Ct. at 1566.

Here, the Court is confident that disclosure of the Barnwell and Bundrum statements would not have "put the whole case" against Chandler "in such a different light as to undermine confidence in the verdict." It bears repeating that Chandler was neither charged nor convicted of the Burroughs and McFry murders. The evidence regarding Burroughs and McFry was offered solely on the issue of Chandler's intent to kill Shuler, and the jury was instructed to consider it for that purpose alone. Moreover, there was ample evidence that directly established Chandler's intent to kill Shuler—particularly the testimony of Charles Ray Jarrell, which the jury necessarily had to believe to convict Chandler. Other evidence of Chandler's intent came from Raymond Pointer and Billy Jo Jarrell, and from government's trial exhibit 45—the tape recording of Chandler complaining about getting "set up" in Georgia, and remarking that if it happened again, he would "just have to kill somebody."

This strong evidence of intent eclipses the peripheral evidence regarding Burroughs and McFry. Even had Chandler's trial counsel completely neutralized the implication of Chandler in the Burroughs and McFry deaths, the jury would still have been in the position of basing its verdict on whether it believed Charles Ray Jarrell and the evidence that corroborated his trial testimony. Taken in the context of the evidence presented against Chandler as a whole, the Burroughs and McFry evidence was of trifling significance. Thus, the Court concludes that there is no reasonable probability that the outcome of the guilt/innocence phase would have been different if Chandler's trial counsel had called Bundrum and Barnwell as witnesses.

Chandler also argues that this evidence could have made a difference at the sentencing phase. Chandler opines that the jury sentenced him to death because the government portrayed him as a "highly dangerous multiple murderer," and he argues that the subtraction of Burroughs and McFry from the equation would have made the jury less likely to impose the death penalty.

This argument fails both because it ignores the trial transcript and because it assumes

that the jury disobeyed the instructions given at the sentencing phase. A review of the government's closing argument at the sentencing phase shows only one mention of Burroughs and McFry: Joe Hubbard identified the Burroughs and McFry evidence as evidence of "substantial planning," which was one of the aggravating factors relied upon by the government. (Tr. 12–68 to –69). However, the jury's verdict in the sentencing phase was that the government had *failed to prove* the "substantial planning" aggravating factor beyond a reasonable doubt. Instead, the jury found only that the crime had been committed, and that Chandler had procured Shuler's murder through promise or payment of money. The identification of the Burroughs and McFry evidence with the "substantial planning" factor suggests that the jury did not believe that the government had established Chandler's participation in the Burroughs and McFry murders.

■ In addition, the jury was instructed at the sentencing phase not to consider any aggravating factors other than those relied upon by the government. (Tr. 12–80). Chandler's argument, however, is that the jury secretly disobeyed this instruction and relied upon another aggravating factor—the Burroughs and McFry murders. This argument cannot stand in the face of the fundamental presumption that a jury follows the instructions given to it by the court. *See, e.g.,* United *States v. Stone,* 9 F.3d 934, 938 (11th Cir.1993). This presumption negates any prejudice claimed by Chandler at the sentencing phase of his trial.

So, Chandler has failed to show that there is a reasonable probability that the testimony of Joe Barnwell and Mike Bundrum would have affected the outcome of the trial if it had been available to trial counsel.[21] Thus,

claims III B 5 g and III B 6 b are due to be denied.

## V. Assessment of cumulative prejudice

Finally, the Court has re-examined its December 17, 1996 finding that the cumulative prejudice suffered by Chandler as a result of all potential *Brady* claims, particularly in light of claims III B 5 g and III B 6 a. After doing so, the Court remains convinced that, even when viewing the potential *Brady* claims in the aggregate, Chandler has failed to show that the suppressed evidence would have been reasonably probable to affect the outcome of the trial. In so finding, the Court observes that many of the *Brady* claims dealt with highly peripheral issues in a case where the government relied upon strong evidence of the charged conduct that the jury obviously found both credible and persuasive. Even if Chandler's trial counsel had chosen to raise all of these issues, they would have been mere sidelights to the government's case against Chandler. Thus, the Court concludes that, viewing the record in its entirety, Chandler has failed to demonstrate prejudice regarding his *Brady* claims.

Chandler also argues that the prejudice from his *Brady* claims should be aggregated with the prejudice under any ineffective assistance claims. As Chandler points out, the Court expressed the opinion that the prejudice inquiry regarding the claim that Chandler's trial counsel failed to present mitigating evidence was a close question. Chandler argues that adding the prejudice from this claim to the small prejudice he suffered as a result of the *Brady* claims would surely suffice for a finding of overall prejudice. The Court need not reach the legal issue of whether it is proper to aggregate prejudice from *Brady* and ineffective assistance claims. Here, Chandler's *Brady* claims add little or

---

21. The Court also notes that, if Chandler's trial counsel would have presented the Barnwell and Bundrum evidence at trial, the government could have called Scottie Surrett as a witness to further implicate Chandler in the McFry murder. The Court excluded Surrett's testimony regarding the conversation between Chandler and Scott Hackney on the ground that Hackney's statements were co-conspirator admissions that were not in furtherance of the conspiracy. (Tr. 5–2 to –17). However, if Chandler had challenged the govern-

ment's attempts to connect him to the Burroughs and McFry murders, Scottie Surrett could have been called to testify regarding McFry's statements that he had stolen large quantities of marijuana from Chandler (a statement against interest) and that he was afraid Chandler would kill him in retaliation (a statement of an existing state of mind). Surrett's testimony thus would have more than offset any benefit arguably derived from the Barnwell and Bundrum statements.

nothing to the prejudice inquiry, because of their highly peripheral nature. Even adding the prejudice together, Chandler has failed to show a reasonable probability that a different result would have come about at his trial.[22]

To conclude, none of the remaining claims under 28 U.S.C. § 2255 or Fed.R.Crim.P. 33 warrant relief for Chandler. The Court will enter a separate final Order denying all remaining claims and entering a final judgment in favor of the government with regard to Chandler's petition.

---

22. However, the Court wishes to note that it has substantial doubts about whether it would be proper to aggregate prejudice from *Brady* and ineffective assistance claims as a general rule or in this case. Here, for example, Chandler's *Brady* claims deal primarily with guilt/innocence issues, while the main claim of ineffective assistance arises from trial counsel's failure to present mitigation evidence at the sentencing phase. It seems illogical to hold that the *Brady* claims did not affect the outcome of the guilt/innocence phase, that counsel's performance did not affect the outcome of the sentencing phase, and then to hold that, taken together, the proceeding as a whole was affected.